# THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS *v.* UNITED STATES (No. 3441)[1]

---

[1] T. D. 45773.

United States Court of Customs and Patent Appeals, June 20, 1932

*Sveinbjorn Johnson* for appellant.
*Oscar E. Carlstrom*, Attorney General of Illinois, for the State of Illinois.
*Charles D. Lawrence*, Assistant Attorney General (*Daniel P. McDonald*, special attorney, of counsel), for the United States.

[Oral argument February 29, 1932, by Mr. Johnson and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court holding certain laboratory equipment, imported by appellant at the port of Chicago, to be used for educational purposes, dutiable as classified and assessed by the collector under various paragraphs of the Tariff Act of 1922.

Appellant filed protests against such classifications, claiming that the imported merchandise was free of duty—

as being imported by an instrumentality of the government of the State of Illinois, for use in the execution of a governmental function and purpose.

Appellant concedes that the merchandise is dutiable as classified unless it is entitled to free entry.

The lower court overruled the protests and entered judgment accordingly. From such judgment this appeal is taken.

The question presented is whether the Government has any constitutional right to impose the duties here involved.

Appellant's claim for free entry is based upon a claimed implied exemption enjoyed by the State and National Governments from taxation assessed by one against the other's essential agencies or instrumentalities upon the theory that the University of Illinois is an agency of the State of Illinois engaged in the performance of governmental functions of that State wholly of a public character.

The Government, on the other hand, contends that the duty in question is a valid exercise of the taxing power of the Congress under clause 1, section 8, Article I of the Constitution of the United States, pursuant to which the Tariff Act of 1922 was enacted. Said clause reads as follows:

1. To lay and collect taxes, duties, imposts, and excises to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts, and excises shall be uniform throughout the United States.

The Government contends that the maintenance of a university by a State is not a governmental function, but is proprietary, and that, therefore, under the decision in the case of *South Carolina* v.

*United States*, 199 U. S. 437, the duties in question were properly imposed. It also makes another contention, viz, that the importation of merchandise is a privilege, not a right, and that the Government may impose conditions upon its importation, such as the payment of the duties here in question, under and by virtue of clause 3, section 8, Article I of the Constitution of the United States, which clause reads as follows:

3. To regulate commerce with foreign nations, and among the several States and with the Indian tribes.

Appellant, on the other hand, relies upon the cases of *McCulloch* v. *Maryland*, 4 Wheat. 315, *Collector* v. *Day*, 11 Wall. 113, and many subsequent cases in support of its contention. It denies that the functions of the University of Illinois are such as to bring the property, devoted by it to educational uses, within the taxing power of the Federal Government.

The evidence produced upon the trial establishes that the University of Illinois was organized in 1867 by a general statute enacted by the Legislature of the State of Illinois. Said act denominated the institution as the "Illinois Industrial University." Its control was vested in a board of trustees, all of whom were appointed by the governor. The full term of each trustee was fixed at six years, and all vacancies occurring were to be filled by appointment by the governor and confirmed by the senate. Broad powers were conferred upon the board to establish and conduct a higher institution of learning. Much subsequent legislation was enacted relative to the university. It is sufficient, for the purposes of this case, to say that, by act of the Legislature, the name of the institution was changed to "University of Illinois," and that, at the time of the importations here involved, its trustees were at stated times elected by the people of the State of Illinois, with the governor and the superintendent of public instruction as *ex officio* members of the board.

The board is given power to sue and be sued; all of the property pertaining to the university is held by the board in trust for the State of Illinois, and is carried upon the books as State property, being inventoried, in 1925, at $17,114,917.13; the institution is supported mainly by appropriations made by the Legislature of said State, amounting to over $5,000,000 annually; the comptroller of the university reports regularly to the governor and State auditor. Equipment purchased for the use of the university is paid for by vouchers drawn by the auditor of public accounts of the State against State appropriations, and the duties involved in the case at bar were paid directly out of the treasury of the State of Illinois.

The student body of the university was, at the time of the importations here in question, about 12,000 in number, approximately 10,000 of whom were residents of the State, 2,000 being resident

elsewhere. No tuition is charged to students resident in the State of Illinois, but what is called a "service fee," amounting to about $60 annually, is paid by each student. Students from outside the State are charged, in addition to said service fee, a tuition fee of about $25 a year.

The land grant made by Congress in 1862 to the State of Illinois to aid colleges for the benefit of agriculture and mechanical arts was, by said State, turned over to said board of trustees, to be used for the benefit of the university, and, under various acts of Congress enacted since said year, donations have been made by the Federal Government in aid of the university. At the present time such donations amount to about $360,000 annually. The income from student fees is approximately $750,000 annually. The university also has certain endowments bestowed by private persons, amounting to about $400,000, from which an annual income of approximately $20,000 is derived.

Practically all funds received by the university are devoted to educational purposes in branches above the grade of the common school and high school.

The primary question presented here involves the power of the administrative officers of the United States, acting in alleged pursuance of authority expressed in an act of Congress, to assess and collect duties on goods imported by and for the use of a State or one of its governmental agencies. The question is one of vast importance and merits and has received the most careful consideration by counsel and the court.

In the organization of our constitutional system many difficulties were experienced. The colonies, or States, had each developed as self contained and independent communities, with varying customs and laws. Zealous in the maintenance of their institutions, the States yielded, with caution, any exclusive rights of government to the General Government. The constitutional government of the Nation was adopted only because experience had demonstrated that there must be such a general government that the people of the States might be secure in their persons and property. It was a union for defense and security.

Hence, the exclusive governmental powers given to the National Government were such as would provide for the "general defense and welfare" of all the people. These powers come from the people, not from the States. *McCulloch* v. *Maryland*, 4 Wheat. 315.

Whatever doubts may have been felt by any of those who framed the Constitution, and by the States in the ratification thereof, as to certain of the powers granted to the new government, there seems to have been no conflict of opinion as to granting to the Federal Government full and exclusive control of the external affairs of the Nation.

This included the rights to levy and collect imposts and duties on imports from foreign countries and to regulate international commerce. The contemporaneous exposition of this subject by Hamilton is illuminating. The Federalist, Nos. XXXII, XXXIII, XXXIV, and XXXV.

This exclusive power has been recognized and vitalized by the courts. No more comprehensive discussion of the subject can be found than in *McCulloch* v. *Maryland, supra*. There Chief Justice Marshall set up certain milestones:

> If any one proposition could command the universal assent of mankind, we might expect it would be this—that the government of the Union, though limited in its powers, is supreme within its sphere of action.
>
>    *       *       *       *       *       *       *
>
> The sword and the purse, all the external relations, and no inconsiderable portion of the industry of the nation, are intrusted to its government.
>
>    *       *       *       *       *       *       *
>
> The government which has a right to do an act, and has imposed on it the duty of performing that act, must, according to the dictates of reason, be allowed to select the means.

The undivided authority of the General Government over imports and import duties and foreign commerce, if, in fact, it has ever been doubted, is confirmed by many authorities. *Collector* v. *Day*, 11 Wall. 113; *Fairbank* v. *United States*, 181 U. S. 283; *Willcuts* v. *Bunn*, 282 U. S. 216. In *License Cases*, 5 How. 504, it was said that the controlling and supreme power over commerce with foreign nations and the several States was undoubtedly conferred upon Congress:

> And here is the limit between the sovereign power of the State and the Federal power. That is to say, that which does not belong to commerce is within the jurisdiction of the police power of the State; and that which does belong to commerce is within the jurisdiction of the United States (599).

The doctrine is also stated in *Gibbons* v. *Ogden*, 9 Wheat. 1; *Weston* v. *Charleston*, 2 Pet. 448; *Dobbins* v. *Erie Co.*, 16 Pet. 434; *Mobile* v. *Kimball*, 102 U. S. 691, 697; *Webber* v. *Virginia*, 103 U. S. 344, 351; *Van Brocklin* v. *Tennessee*, 117 U. S. 151; *Brennan* v. *Titusville*, 153 U. S. 289, 299; *Buttfield* v. *Stranahan*, 192 U. S. 470.

These cases announce the broad principles that the State governments not only have no right in themselves to levy and collect import duties or to regulate foreign commerce, but that they can not interfere with, obstruct nor question the policy of, any law which Congress may, in pursuance of its constitutional functions, enact on these subjects.

The power to lay imposts or duties and the power to regulate commerce may and often do, find expression in the same act of Congress. The statutory provision may be the combined judgment of the legislative body and may embrace objects extending beyond that of revenue. It was said in *Gibbons* v. *Ogden, supra* (pp. 199, 202),

that the act of laying duties or imposts on imports or exports was, very clearly, an exercise of the taxing power. Yet Chief Justice Marshall, following this expression, as clearly announced:

It is true that duties may often be, and in fact often are, imposed on tonnage with a view to the regulation of commerce; but they may be also imposed with a view to revenue. * * * The idea that the same measure might, according to circumstances, be arranged with different classes of power, was no novelty to the framers of our Constitution. * * * The right to regulate commerce, even by the imposition of duties, was not controverted.

From the beginning Congress has exercised a plenary power in respect to the exclusion of merchandise brought from foreign countries—

not alone directly by the enactment of embargo statutes, but indirectly as a necessary result of provisions contained in tariff legislation. It has also, in other than tariff legislation, exerted a police power of foreign commerce by provisions which in and of themselves amounted to the assertion of the right to exclude merchandise at discretion. (*Brolan* v. *United States*, 236 U. S. 216.)

An additional duty fixed upon goods coming from east of the Cape of Good Hope was held to be valid as a regulation of commerce. *Russell* v. *Williams*, 106 U. S. 623. In the more recent case of *Hampton* v. *United States,* 276 U. S. 394, the Supreme Court was of the opinion that a customs duty, although imposed in pursuance of an expressed policy of protection to domestic industries, was valid and enforcible. To like effect was *Arnold* v. *United States*, 147 U. S. 494, 497. The power to regulate commerce—

like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution. (*Gibbons* v. *Ogden, supra*, 195.)

It has repeatedly been announced that the Congress may place an embargo, total or partial, upon importations from foreign countries, under the exercise of the constitutional powers to regulate commerce. *United States* v. *Marigold*, 9 How. 559; *The Abby Dodge*, 223 U. S. 166; *Weber* v. *Freed*, 239 U. S. 325; *Hammer* v. *Dagenhart*, 247 U. S. 251. As Congress has the right to absolutely prohibit importation, it also has plenary power to prescribe the conditions upon which the importation may be made. *Sang Lung* v. *Jackson*, 85 Fed. 502; *United States* v. *American Exp. Co.*, 177 Fed. 735, 738—

Impost duties take every conceivable form, as may by the legislative authority be deemed best for the general welfare. They have been at all times often specific. They have sometimes been discriminatory, particularly when deemed necessary by reason of the tariff legislation of other countries. (*Knowlton* v. *Moore*, 178 U. S. 41, 88.)

We come, therefore, to this conclusion, based on reason and on the conclusive authorities cited, that it was within the constitutional power of the Congress to fix a rate of import duties to be paid when the articles imported here entered the commerce of the country.

This it might do for purposes of raising revenue; it might do it as the result of a national policy of protection to the industries of the country; it might do it as a regulation of foreign commerce; for all these powers were within its exclusive power. What the purpose was, so long as it was fairly within the sphere of its constitutional functions, the appellant, or the State government of which it claims to be a part, can not question. Assume that the statute before us, instead of fixing a certain rate of duty, had declared a total embargo upon the importation of such articles. Could the State have ignored this embargo and imported the articles? We dare say there are none who will so contend. If, then, its importation may be prohibited, may it not, by the same power, be conditionally admitted? Upon what theory may a State contend that what the General Government may do in whole, as a matter of national policy, it may not do in part?

Here, if there were otherwise question as to the purposes of Congress in enacting the statute before us, we need have no doubt. The preamble to the Tariff Act of 1922 is:

An Act to *provide revenue,* to *regulate commerce* with foreign countries, to *encourage the industries* of the United States, and for *other purposes.* (Italics ours.)

The appellant has treated this question as if the right to import were undisputed, and the imposition of a tax was upon not only the exercise of a necessary governmental agency, but upon the exercise of a right which was absolute. But this view is fallacious. No individual has a vested right to import articles from a foreign country. His right to do this must depend upon the authority to do so conferred by act of Congress and upon the terms so fixed. *Buttfield* v. *Stranahan, supra.*

Nor, in reason, can it be seen how an agency of a State stands in any different position from an individual in this respect. The appellant had the right to import, but its right was conditional. It will be borne in mind that the goods imported in the case at bar were foreign goods and did not become merged into the commerce of the country until the duties were levied and paid. *Sonneborn Bros.* v. *Cureton,* 262 U. S. 506, 509; *Faber, Coe & Gregg* v. *United States,* 19 C. C. P. A. (Customs) 8, T. D. 44851. So, a tax upon the imported goods, while it remains a part of foreign commerce and is not introduced into the general mass of property in a State, differs greatly from a tax upon the property after it has been imported. *License Cases, supra* (575).

These observations seem, legitimately, to lead us to the conclusion that the duties herein were properly imposed. The appellant, however, vigorously contends that, under a well-considered line of authorities, the State of Illinois and its various governmental agencies are exempt from the payment of these duties. This contention rests upon

two premises: First, that an impost or duty is a tax; second, that the taxing power of the Government may not be applied to the agencies, instrumentalities, and property of the State.

In support of the first premise, appellant relies upon *Brown* v. *Maryland*, 12 Wheat. 419, 439, in which the Supreme Court announced the principle, "A duty on imports is a tax on the article which is paid by the consumer."

The second premise is claimed to be sustained by a line of cases beginning with *McCulloch* v. *Maryland, supra*. In that case, in which the State of Maryland attempted to extend her taxing powers to national banks, the great chief justice announced the essential doctrine that each government, State and national, must continue to exist and perform its full functions, unimpeded and unobstructed by the other, and that neither might destroy the functions or agencies of government of the other by taxation, *or otherwise*. The Supreme Court, in the case cited, did not alone refer to taxation—it referred to any means by which one government might weaken or destroy the other in the performance of its legal or constitutional functions.

The principle thus announced has been sustained and developed by many cases: *Weston* v. *Charleston*, 2 Pet. 448; *Dobbins* v. *Erie Co.*, 16 Pet. 434; *United States* v. *Ry. Co.*, 17 Wall. 322; *Ry. Co.* v. *Peniston*, 18 Wall. 1, 30; *Ohio* v. *Thomas*, 173 U. S. 276; *South Carolina* v. *United States*, 199 U. S. 437; *Flint* v. *Stone*, 220 U. S. 107; *Johnson* v. *Maryland*, 254 U. S. 51; *Metcalf* v. *Mitchell*, 269 U. S. 514; *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218; *Indian Motocycle Co.* v. *United States*, 283 U. S. 570.

The maintenance of our dual form of government has made necessary such a rule. Otherwise, such a system could not long exist—

But recourse may be had to the reason upon which the rule rests, and which must be the guiding principle to control its operation. Its origin was due to the essential requirement of our constitutional system that the Federal Government must exercise its authority within the territorial limits of the States; and it rests on the conviction that each government, in order that it may administer its affairs within its own sphere, must be left free from undue interference by the other. (*Metcalf et al.* v. *Mitchell*, 269 U. S. 514, 523.)

The same idea was expressed in *Educational Films* v. *Ward*, 282 U. S. 379, and *Brown* v. *Houston*, 114 U. S. 622, 630.

In the recent unreported case of *Fox Film Corp.* v. *Doyal*, decided May 16, 1932, Chief Justice Hughes, speaking for the court, said:

The principle of the immunity from State taxation of instrumentalities of the Federal Government, and of the corresponding immunity of State instrumentalities from Federal taxation—essential to the maintenance of our dual system—has its inherent limitations. It is aimed at the protection of the operations of Government, *McCulloch* v. *Maryland*, 4 Wheat. 316, 436, and the immunity does not extend "to anything lying outside or beyond governmental functions and their exertions."

In the later cases since *Brown* v. *Maryland, supra,* the tax involved has been such a tax or excise as was within the power of either government to impose. There were no questions of import duties, or regulation of commerce, or foreign relations, exclusive powers of the National Government, involved. One government was so functioning as to weaken or impair the other in a field common to both, and this may not be done. If, however, in the operation of a national policy, in pursuance to a constitutional power which is exclusive, the revenues of a State are incidentally decreased, must the interests of the State not be subservient to the general welfare of all? The operation of national navigation, immigration, or tariff laws may discriminate, in their effect, between communities and States, because of their diverse industries and conditions. Thus, the revenues of the State may be impaired. But does this render the laws unconstitutional? A State may desire to import articles from foreign countries. If it does so, having entered a field entirely within the control of the National Government, it must assent to and conform with every constitutional provision which the National Government has made concerning the same. For these reasons, we are of opinion that the cases heretofore referred to in this branch of the case are not decisive of the point here involved.

To concede that the State of Illinois, or any State, might disregard and nullify, when it considers its own interests injuriously· affected, provisions of law exclusively within the control of the National Government, is to weaken and decrease the Federal revenues, to nullify, to an essential degree, its power to regulate international commerce, and to set at naught any other policy which the Congress may have had in mind in enacting the legislation, affecting the welfare of all the people of the Union. In forming our national compact, the Constitution, the people of all the States freely and voluntarily consigned these governmental rights into the hands of the General Government. Whatever rights the States had in this respect were then yielded up, and they can not now assert them.

For about 150 years of national existence there has heretofore been no challenge of this power. The administrative officers of both States and Nation have proceeded upon the theory that such duties should be paid by anyone, whether individual citizen or governmental unit, not exempted by the acts of Congress from such payment. The Congress assumed it had such power and in the Tariff Act of July 24, 1897, 30 Stat. 203, paragraph 702, when it was thought desirable to permit free entry of certain goods by a State, it so provided. Such provisions have continued in succeeding acts, including the Tariff Act of 1922, paragraph 1706 (42 Stat. 934). Certainly, such a long-continued administrative, executive, and legislative construction of these constitutional provisions by both States and Nation, are entitled

to great weight in our determination of this matter. *Hampton & Co.* v. *United States, supra.*

While perhaps unnecessary to a decision of the case, another point may be adverted to. The activities in which the State governments may legally engage are without number. They may conduct the business of grain elevators, banks, and building associations. *Green* v. *Frazier,* 253 U. S. 233. Cities which are units of the State government, *United States* v. *Railway Co., supra,* may conduct fuel yards, *Jones* v. *Portland,* 245 U. S. 217, or public utilities. *Springfield G. & E. Co.* v. *Springfield,* 257 U. S. 66. It is true that in *South Carolina* v. *United States, supra,* it was held that the agencies of a State were exempted from a Federal tax only when such agencies were performing the *ordinary* functions of government, and that dispensing alcoholic liquors was not such an ordinary function.

How far the courts might be called upon to go in holding importation for the various legal activities of a State to be in discharge of its ordinary functions, is uncertain. One fact, however, is obvious: The States, with their various lesser governmental units, cities, villages, counties, drainage, sanitary and reclamation districts, school boards, road districts, and the like, have myriad activities unknown to the framers of the Constitution. Such functions as the building of roads and schools, the employment of convicts, the building of canals, sewers, harbors and levees, are certainly all within the exercise of the ordinary functions of the State. May concrete and stone and building material, road material, materials to employ the labor of convicts, and the like, be imported free of duty by a State, when the individual purchaser must pay the additional price due to the imposition of a duty? To so hold will lead to the result so aptly stated in *South Carolina* v. *United States, supra:*

Suppose a State assumes under its police power the control of all those matters subject to the internal revenue tax and also engages in the business of importing all foreign goods. The same argument which would exempt the sale by a State of liquor, tobacco, etc., from a license tax would exempt the importation of merchandise by a State from import duty. While the State might not prohibit importations as it can the sale of liquor, by private individuals, yet paying no import duty it could undersell all individuals and so monopolize the importation and sale of foreign goods.

Obviously, if the power of the State is carried to the extent suggested, and with it is relief from all Federal taxation, the National Government would be largely crippled in its revenues. Indeed, if all the States should concur in exercising their powers to the full extent, it would be almost impossible for the Nation to collect any revenues. In other words, in this indirect way it would be within the competency of the States to practically destroy the efficiency of the National Government.

We are of opinion that the appellant, whether it be considered a governmental agency of the State of Illinois or not, was not exempt from the payment of the duties imposed by the collectors on the im-

ported goods in the case at bar. This being true, a further consideration of the governmental status of the appellant is unnecessary to a disposition of the case.

The judgment of the United States Customs Court is *affirmed*.

### CONCURRING OPINION

BLAND, Judge: I, like my associates, Presiding Judge Graham and Judge Hatfield, conclude that the judgment below must be affirmed, and in this result I concur. Since some of the chief reasons which bring me to this conclusion have not been sufficiently emphasized in the foregoing opinion, and in view of the importance of the case, I will state my position as briefly as possible.

Upon the record in this case two major questions are presented: First. Is it shown by this record that the University of Illinois is an agency of the State of Illinois and as such engaged in performing a governmental function when it imported laboratory equipment for use in its educational work? Second. If it is performing a governmental function, can the Federal Government constitutionally levy an import duty upon such importation?

Since this case was argued in this court, the Supreme Court of the United States in *Burnet* v. *Coronado Oil & Gas Co.*, 284 U. S. —, held that the assessment by the Commissioner of Internal Revenue of income and excess-profit taxes upon the net income of the lessee of public school lands of Oklahoma, which income arose from oil produced on such lands, violated the constitutional rights of the State of Oklahoma. A majority of the court held that when the State of Oklahoma leased her public school lands for the benefit of the public schools, she exercised a function strictly governmental in character. The decision is based upon the authority of *Gillespie* v. *Oklahoma*, 257 U. S. 501, which held that the State of Oklahoma had no right to tax income derived by a lessee of Indian land from sales of oil and gas received under the lease. While the decision in the *Burnet* case does not expressly state that the activity of a State in connection with all kinds of education is a governmental function, it does hold that the maintenance of public schools is the exercise of such a function.

If I were to pass upon the question as to whether or not the State's maintenance of a university was strictly the exercise of a governmental function, I might regard *Burnet, supra*, and other cases relied upon by appellant, as very persuasive authority in favor of the affirmative of this proposition. The facts in this record, however, are quite different from those in the *Burnet* case. Whether the difference in the facts of the case at bar and those of the *Burnet* case might properly be the basis for distinguishing this case from the *Burnet* case, I do not feel called upon to determine. The exact question is not whether Illinois is performing a governmental function

in the maintenance of a university, but whether it is performing a governmental function when it imports foreign merchandise to be used by such university in connection with education. In view of my conclusion on the second question, it will not be necessary for me to discuss the first.

As to the second question, I am of the opinion that the Federal Government has the constitutional authority to levy import duties, such as are provided for in the Tariff Act of 1922, upon any importation imported by the State of Illinois, regardless of the use for which the merchandise is intended.

The representatives of the States in the Constitutional Convention, in order to form the character of union desired, realized that it was necessary for the States to surrender to the Federal Government certain powers which they had enjoyed. Some of such powers were surrendered absolutely, such as the control of patents, currency, naturalization, bankruptcy, etc. Certain other powers were given the Federal Government, but not to the exclusion of the same powers being exercised by the States. In numerous instances, they vested in the Federal Government exclusive powers to do things which could not be properly done if both sovereignties operated in the same field. One of the powers given to the Federal Government was that of laying and collecting taxes, but the States did not give it the exclusive right in taxation matters. The Constitution does not say it, but it is well established that the States could not have intended to surrender their taxing powers entirely, because to do so would have been to deprive themselves of the ability to maintain government. Where the same powers are exercised by both sovereignties, controversy as to the limits of each sovereignty's power would necessarily arise.

The courts early held that the Constitution must be held to be a bar to the sovereignty of one government taxing the necessary and strictly governmental functions of the other, although no express language to that effect is found in the instrument. To hold otherwise would have left one sovereignty free to unduly burden and handicap the other in the exercise of the functions which each was to have and lead to a result which was destructive of the purposes which the fundamental law sought to accomplish.

Prior to the ratification of the Constitution, the States, while acting independently, levied and collected import duties. By clause 3, section 8, Article I, of the Constitution, they surrendered to the Federal Government the right to regulate commerce with foreign nations and among the other States, and by clause 1 of the same section and article, empowered the Federal Government to lay and collect duties and imposts. As far as we are advised, it has not been contended that the States intended to reserve to themselves any part of the duty of

regulating commerce with foreign nations or among the several States. The very nature of these duties suggests that dual control in these particulars was impracticable. Dual power of levying taxes in the States, although presenting vexatious problems as to the scope of authority of the respective sovereignties must, in the very nature of things, have been within the contemplation of the framers. It is to be observed, however, that the right to lay and collect taxes by the Federal Government is granted in the same clause which granted the power to lay and collect duties and imposts, and that the power to regulate commerce between the States is granted in the same clause as the power to regulate commerce with foreign nations, but this fact does not compel the conclusion that as far as the question involved here is concerned the same limitations as to each of the powers must apply.

The Supreme Court of the United States, in *Brown* v. *Maryland*, 12 Wheat. 419, 436, 439, held that the tariff duty was the levying of a tax upon the consumer of the imported article, and it held in substances in *Adair* v. *United States*, 208 U. S. 161, *Gibbons* v. *Ogden*, 9 Wheat. 1, 196, and the *Lottery Case*, 188 U. S. 321, 353, that under the power to regulate interstate commerce, the Federal Government could not exercise this power in violation of the fundamental rights of the States secured by the provisions of the Constitution. The soundness of these decisions, when applied to the facts in those cases does not admit of doubt. Of course the Federal Government, under the guise of regulating interstate commerce, could not tax the commerce of a State out of existence, and the same principle would apply to the levying of a protective tariff duty in regulating foreign commerce, if it so burdened the States as to defeat the intent of the framers of the Constitution. Its power to regulate interstate commerce could not be exercised in such a way as to destroy the State's fundamental rights which it had not surrendered to the Federal Government. And just here lies the distinction between these cases and the case at bar.

How could the Federal Government regulate foreign commerce by the imposition of protective tariff duties or by embargo, and thereby control, in many instances, the volume of importations, if, at the same time, the State had the right to import for its own use, upon wholly different terms, the same merchandise? It is unthinkable that the framers of the Constitution ever contemplated that the duty of regulating foreign commerce was a joint function of the States and the Union, or that the duties of the Federal Government in this respect could be carried out if interference by the States in the same field of action was tolerated.

The Tariff Act of 1922, in its preamble, states—

An Act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, and for other purposes.

Most of its dutiable provisions are definitely aimed at protecting American industries through the regulation of foreign commerce. Furthermore, the act contains the flexible tariff provision which provides a special system of machinery for equalizing production costs without further investigation by Congress. It also contains the special proviso (section 316) for embargo and special duties which apply in case of unfair acts in the importation of merchandise. The act, therefore, is far more than a mere revenue act.

Regardless of whether the levying of a tariff duty is the laying of a tax upon the consumer of the imported article, as was held in *Brown* v. *Maryland, supra,* it is nevertheless in part the result of the exercise by the Federal Government of its power to regulate foreign commerce. See *Hampton, Jr.,* v. *United States,* 276 U. S. 394. Since it is the exercise in part at least of the function of the Federal Government in regulating foreign commerce, and even though it be a tax, it is not such a tax as the Federal Government is, by the Constitution, barred from imposing upon the importer of goods.

That the imposition of duty on the particular item of importation at bar is in part the exercise by the Federal Government of its foreign commerce-regulating power, is too obvious to require extended discussion here. The context of the act under consideration and the legislative history of the dutiable status of merchandise of this character unquestionably suggest that Congress sought by the levy of this particular duty to regulate in a measure the trade in this commodity with foreign nations.

It was within the intent of the framers of the Constitution that one means of regulating the foreign commerce was the imposition of protective duties. James Madison, ofttimes styled the father of the Constitution, and who probably, during his lifetime, was more familiar with the motives prompting the actions of the framers than any other human being, was unqualifiedly of the opinion that the levying of a protective duty was the exercise of the constitutional power granted the Congress to regulate foreign commerce. In his letter of September 18, 1828, to Joseph C. Cabell, he emphatically expresses this view, giving his reasons therefor at great length and with much clearness. This letter may be found at page 9590 of the Congressional Record, volume 72, part 9, Seventy-first Congress, second session. Among the many reasons assigned for concluding that the framers of the Constitution, by the provision "the power to regulate commerce with foreign nations," had in mind the imposition of duties which equalized

cost of production and thus fostered domestic manufactures, were the following:

The Constitution vests in Congress expressly "the power to lay and collect taxes, duties, imposts, and excises," and "the power to regulate trade."

That the former power, if not particularly expressed, would have been included in the latter as one of the objects of a general power to regulate trade is not necessarily impugned by its being so expressed. Examples of this sort can not sometimes be easily avoided and are to be seen elsewhere in the Constitution. * * *

Nor can it be inferred that a power to regulate trade does not involve a power to tax it, from the distinction made in the original controversy with Great Britain, between a power to regulate trade with the Colonies and a power to tax them. * * *

 *       *       *       *       *       *       *

8. That the encouragement of manufactures was an object of the power to regulate trade is proved by the use made of the power for that object in the first session of the First Congress under the Constitution, when among the members present were so many who had been members of the Federal convention which framed the Constitution, and of the State conventions which ratified it; each of these classes consisting also of members who had opposed and who had espoused the Constitution in its actual form. It does not appear from the printed proceedings of Congress on that occasion that the power was denied by any of them. And it may be remarked that members from Virginia in particular as well of the anti-Federal as the Federal Party, the names then distinguishing those who had opposed and those who had approved the Constitution, did not hesitate to propose duties, and to suggest even prohibitions, in favor of several articles of her production. By one a duty was proposed on mineral coal in favor of the Virginia coal pits, by another a duty on hemp was proposed to encourage the growth of that article, and by a third a prohibition even of foreign beef was suggested as a measure of sound policy. (See Lloyd's Debates.)

In *South Carolina* v. *United States*, 199 U. S. 437, in discussing the powers of the Federal and State sovereignties to impose taxes, the Supreme Court of the United States said:

To determine the extent of the grants of power we must, therefore, place ourselves in the position of the men who framed and adopted the Constitution, and inquire what they must have understood to be the meaning and scope of those grants.

It was there further said that—

The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted it means now.

Since it is clear that the States surrendered to the Federal Government the exclusive right to regulate foreign commerce by the imposition of import duties, it is unthinkable that they could have intended that the States themselves might import goods of every kind and character used in performing State functions and thereby render it impossible for the Federal Government to successfully and adequately regulate such commerce, and especially to regulate it so as to comply with the mandate, "All duties, imposts, and excises shall be uniform throughout the United States."

The fact is conceded, and it is certainly not contestable, that the right of a State to be immune from Federal taxation carries with it the immunity of all of its subdivisions—its counties, towns, cities, and all of their respective agencies, which perform a governmental function. Under the contention of appellant, all of these agencies would have the right to import free of duty all supplies of every kind and character used in building courthouses, jails, asylums, schools, roads, bridges, etc. They would have the right to import furnishings, books, clothing, tools, and articles too numerous to enumerate as an incident of performing such governmental functions. Such enormous volume of importations by the States and their subdivisions would be possible under such circumstances as would render impossible the successful uniform regulation by the Federal Government. The framers of the Constitution could not have reasonably intended such a power being reserved to the States.

In *Willcuts* v. *Bunn*, 282 U. S. 216, the court said:

Before the power of the Congress to lay the excise tax in question can be denied in the view that it imposes a burden upon the States' borrowing power, it must appear that the burden is real, not imaginary; substantial, not negligible.

The court there referred to an excise tax, but obviously the framers of the Constitution, in providing that the Federal Government might levy import duties in its regulation of foreign commerce, could have no occasion to levy a duty which would result in burdening the State in the performance of its governmental functions. I do not think a customs duty nor an embargo, if applied in the regulation of foreign commerce of the nation could be or does result in such a burden.

Moreover, this is not a case where the Federal Government goes into the State and levies a tax upon some State governmental activity in such a way that if carried to the extreme it would paralyze the arm of the State Government. On the contrary, it is a case where the State goes outside the United States and buys merchandise and subjects it to laws wholly Federal in character. In bringing it into the commerce of the United States, the State comes in contact with and subjects itself to the Federal Government's laws regulating foreign commerce to which the State assented in the constitutional convention.

The Federal Government, for more than 150 years, has exercised the exclusive power of regulating the importation of foreign articles, whether imported by a State or otherwise, and as far as I am able to learn, this is the first time in the Nation's history that any State has presented for judicial decision the question of its right to import free of duty merchandise made dutiable by an act of Congress. My conclusion that the State has no such right is for the most part based on the consideration of the fact that the existence of such a right in the State is so wholly inconsistent and destructive of other rights

granted to the Federal Government as to be not within the contemplation of the framers of the Constitution.

It is admitted by the appellant that, if its claim of free importation is not sustained, the goods were properly classified by the collector.

The judgment of the United States Customs Court, overruling the protest and holding said merchandise dutiable as assessed, was proper.

### DISSENTING OPINION

GARRETT and LENROOT, Judges (opinion by Lenroot): We are compelled to dissent from the conclusion reached by the majority in this case, as we are of the opinion that the protests of appellant should be sustained.

The case is of such importance that we feel constrained to express our views at length, not only with respect to those questions upon which we disagree with the views of the majority, but also with respect to those upon which we are in accord with the majority opinion.

Upon the state of facts set out in the majority opinion, two major questions are presented for determination:

1. Is the University of Illinois an agency of the State of Illinois performing governmental functions; and, if so, are such functions of such a nature as to exempt property acquired by it, for the purpose of carrying on the educational activities of the university, from the imposition of taxes or duties imposed by Congress by virtue of clause 1, section 8, Article I of the Constitution of the United States, quoted in the majority opinion?

If the answer to the first question be in the affirmative—

2. May the classification and assessment by the collector of the merchandise here involved be sustained as an exercise of power by Congress under clause 3, section 8, Article I of the Federal Constitution, also quoted in the majority opinion?

The first question involves a consideration of the relative powers of the Federal Government and the State government of Illinois with respect to the taxation by one of the property of the other.

That the University of Illinois is an instrumentality of the State of Illinois, performing governmental functions of that State, is established by the evidence in the case.. It was created by a public law of the State of Illinois; its trustees are elected by the people of Illinois. The governor and the superintendent of public instruction are *ex officio* members of the board of trustees. It is controlled wholly by the Legislature of the State and is supported mainly by legislative appropriations out of general tax levies by that State. Property acquired for the use of the university is paid for directly out of the treasury of the State of Illinois. It is engaged in no activity primarily

for profit, and all funds received by the university are devoted to instructional and educational purposes.

In the case of *Thomas* v. *Industrial University* (now the University of Illinois), 71 Ill. 310, 312, the court said:

Is this university, then, a State institution, or is it a private corporation? It has been largely endowed with funds by the State, received by donation for the purpose, from the general government. The act by which it is organized places its control under the authority of the State. The governor is required to appoint, and the senate to confirm, the trustees who control the institution, except the governor and superintendent of public instruction are made *ex officio* members of the board of trustees, for the management of the fund and the government of the university. There is nothing in the act from which it can be inferred that this institution was, in any respect, to be a private corporation, either in whole or in part * * *. Private individuals have no interest in or control over it, but it is, in every sense of the term, a State institution. It, with its property, management, and control, is entirely under the power of the general assembly, and this has been recognized by the general assembly by making subsequent appropriations for the erection of buildings, and to defray expenses, and by expressly prohibiting the board of trustees from obligating the State for the payment of any sum of money in excess of the appropriations thus made. Section 3, acts 1871–2, p. 143.

The character of the University of Tennessee was involved in the case of *University of Tennessee* v. *People's Bank*, 157 Tenn. 87, 6 S. W. (2d) 328. In this case the court in its opinion said:

We are of the opinion that the State, and the public represented by it, must be considered as the owner of property held by the university, and that the sovereign character of the State's ownership is not changed by the creation of the corporation as a convenient means through which the State exercises the strictly governmental function of educating the youth among its citizens. We are not able to find that the State has lost or divested itself of any element of sovereignty in the creation of this corporation which is subject to the will of the legislative branch of the State government in every particular, and the only purpose of which is to perform a governmental function.

In the leading case of *Dartmouth College* v. *Woodward*, 4 Wheat. 517, in considering the character of the charter of incorporation of Dartmouth College, the court said:

If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the funds of the college be public property, or if the State of New Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the State may act, according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States.

In the separate opinion of Mr. Justice Story in said case, the following is found:

* * * strictly speaking, public corporations are such only as are founded by the government, for public purposes, where the whole interests belong to the government. * * *

In the case at bar, the University of Illinois is an instrumentality of the State of Illinois, founded by that State for public purposes, and "the whole interests belong to," and its activities are under the control of, said State.

This fact alone, however, does not render the University of Illinois exempt from taxation by the Federal Government under said clause 1, section 8, Article I of the Federal Constitution, for the law is that an instrumentality of a State, even though performing only functions directed by the State, is not exempt from Federal taxation unless its activities are, as sometimes stated, of a strictly governmental character, as distinguished from those performed in the carrying on of an ordinary private business. *South Carolina* v. *United States*, 199 U. S. 437.

It is well established that the States have no power, by taxation or otherwise, to retard, impede, burden or in any manner control the operation of the constitutional powers of Congress to carry into execution the powers vested in the General Government. *McCulloch* v. *Maryland*, 4 Wheat. 315.

It is equally well established that the Federal Government has no power to tax the means and instrumentalities of the States engaged in the performance of essential governmental functions. *Collector* v. *Day*, 11 Wall. 113.

The case last cited involved the right of the Federal Government to impose a tax upon the salary of a judicial officer of the State of Massachusetts. It was held that no such power existed. In its opinion the court said:

* * * The Constitution guarantees to the States a republican form of government, and protects each against invasion or domestic violence. Such being the separate and independent condition of the States in our complex system, as recognized by the Constitution, and the existence of which is so indispensable, that, without them, the General Government itself would disappear from the family of nations, it would seem to follow, as a reasonable. if not a necessary consequence, that the means and instrumentalities employed for carrying on the operations of their governments, for preserving their existence, and fulfilling the high and responsible duties assigned to them in the Constitution, should be left free and unimpaired, should not be liable to be crippled, much less defeated by the taxing power of another government, which power acknowledges no limits but the will of the legislative body imposing the tax. * * *

The court said further:

* * * It is admitted that there is no express provision in the Constitution that prohibits the General Government from taxing the means and instrumentalities of the States, nor is there any prohibiting the States from taxing the means and instrumentalities of that Government. In both cases the exemption rests upon necessary implication, and is upheld by the great law of self-preservation; as any government, whose means employed in conducting its operations, if subject to the control of another and distinct government, can exist only at the mercy of that government. Of what avail are these means if another power may tax them at discretion?

In the case of *Veazie Bank* v. *Fenno*, 8 Wall. 533, a Federal tax upon the circulating notes of state banks was sustained. In its opinion the court, in discussing the nature of the tax there in question, said:

\* \* \* It may be admitted that the reserved rights of the States, such as the right to pass laws, to give effect to laws through executive action, to administer justice through the courts, and to employ all necessary agencies for legitimate purposes of State government, are not proper subjects of the taxing power of Congress. But it can not be admitted that franchises granted by a State are necessarily exempt from taxation; for franchises are property, often very valuable and productive property; and when not conferred for the purpose of giving effect to some reserved power of a State, seem to be as properly objects of taxation as any other property.

The principle declared in the cases above cited has been followed in many cases decided by the Supreme Court of the United States. One of the most recent of such decisions is the case of *Willcuts* v. *Bunn*, 282 U. S. 216. In the opinion in this case, written by Chief Justice Hughes, it is stated:

\* \* \* The familiar aphorism is "that as the means and instrumentalities employed by the General Government to carry into operation the powers granted to it are exempt from taxation by the States, so are those of the States exempt from taxation by the General Government." *Ambrosini* v. *United States*, 187 U. S. 1, 7. And a tax upon the obligations of a State or of its political subdivisions falls within the constitutional prohibition as a tax upon the exercise of the borrowing power of the State. *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 584–586; id, 158 U. S. 601, 618; *National Life Insurance Co.* v. *United States*, 277 U. S. 508, 521.

The limitation of this principle to its appropriate applications is also important to the successful working of our governmental system. The power to tax is no less essential than the power to borrow money, and, in preserving the latter, it is not necessary to cripple the former by extending the constitutional exemption from taxation to those subjects which fall within the general application of non-discriminatory laws, and *where no direct burden is laid upon the governmental instrumentality*, and there is only a remote, if any, influence upon the exercise of the functions of government. \* \* \* (Italics ours.)

In the case of *South Carolina* v. *United States, supra*, there was presented to the Supreme Court of the United States for the first time the question of whether every function which a State may properly exercise, or activity in which it may engage, is immune from the Federal taxing power.

In that case it was held that a State may control the sale of liquor by the dispensary system, but when it does so it engages in ordinary private business which is not, by the mere fact that it is being conducted by a State, exempt from the taxing power of the National Government. In the opinion, however, the observation was made that the tax there in question was not a tax upon property of the State.

After reviewing a large number of cases upon the subject of the exemption of the National Government from taxation by the States,

and the exemption of the States from taxation by the Federal Government, the court said:

These decisions, while not controlling the question before us, indicate that the thought has been that the exemption of State agencies and instrumentalities from national taxation is limited to those which are of a strictly governmental character, and does not extend to those which are used by the State in the carrying on of an ordinary private business.

The court concluded its opinion in said case with the following:

Now, if it be well established, as these authorities say, that there is a clear distinction as respects the responsibility for negligence between the powers granted to a corporation for governmental purposes and those in aid of private business, a like distinction may be recognized when we are asked to limit the full power of imposing excises granted to the National Government by an implied inability to impede or embarrass a State in the discharge of its functions. It is reasonable to hold that while the former may do nothing by taxation in any form to prevent the full discharge by the latter of its governmental functions, yet whenever a State engages in a business which is of a private nature that business is not withdrawn from the taxing power of the Nation.

In arriving at its conclusion in said case the court adverted to a rule of construction that is material in the case at bar. In its examination of the powers granted in the Federal Constitution, it said:

To determine the extent of the grants of power we must, therefore, place ourselves in the position of the men who framed and adopted the Constitution, and inquire what they must have understood to be the meaning and scope of those grants.

The court further said:

The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted it means now. Being a grant of powers to a government its language is general, and as changes come in social and political life it embraces in its grasp all new conditions which are within the scope of the powers in terms conferred. In other words, while the powers granted do not change, they apply from generation to generation to all things to which they are in their nature applicable. This in no manner abridges the fact of its changeless nature and meaning. Those things which are within its grants of power, as those grants were understood when made, are still within them, and those things not within them remain still excluded. * * *

In the case of *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, speaking of the question of immunity from taxation, the court said:

While it is evident that in one aspect the extent of the exemption must finally depend upon the effect of the tax upon the functions of the government alleged to be affected by it, still the nature of the governmental agencies or the mode of their constitution may not be disregarded in passing on the question of tax exemption; for it is obvious that an agency may be of such a character or so intimately connected with the exercise of a power or the performance of a duty by the one government, that any taxation of it by the other would be such a direct interference with the functions of government itself as to be plainly beyond the taxing power.

In the case of *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218, the power of the State of Mississippi to tax sales of gasoline to the United

States for the use of its Coast Guard fleet, in service in the Gulf of Mexico, and for its veterans' hospital at Gulfport, was involved. It was held that such taxes, as applied to such sales, were void. In its opinion the court said:

* * * The States may not burden or interfere with the exertion of national power or make it a source of revenue or take the funds raised or tax the means used for the performance of federal functions. * * *

In the case of *Indian Motocycle Co.* v. *United States*, 283 U. S. 570, it was held that the sale of motor cycles to a State agency, such as a municipal corporation, for use in its police service, is not subject to taxation by the United States. In its opinion, after stating the principle of immunity from taxation involved, the court said:

Of course, the reasons underlying the principle mark the limits of its range. Thus, as to persons or corporations which serve as agencies of government, national or state, and also have private property or engage on their own account in business for gain, it is well settled that the principle does not extend to their private property or private business, but only to their operations or acts as such agencies; and, in harmony with this view, it also has been held where a State departs from her usual governmental functions and "engages in a business which is of a private nature," no immunity arises in respect of her own or her agents' operations in that business. While these decisions show that the immunity does not extend to anything lying outside or beyond governmental functions and their exertion, other decisions to which we shall now refer show that it does extend to all that lies within that field.

From the foregoing cited cases it is apparent that upon this branch of the case the question for determination is whether public education, conducted through the instrumentality of a university wholly under the control of a State, supported in the main out of the public treasury, and whose property is owned by the State, is such an activity as should be deemed proprietary and therefore not immune from taxation by the Federal Government, or governmental, as distinguished from proprietary, and therefore immune from such taxation.

So far as we are able to discover, the United States Customs Court is the first court to pass directly upon this question. *University of Illinois et al.* v. *United States*, T. D. 43023, 54 Treas. Dec. 319. It was there held that the University of Illinois was not an instrumentality of the State of Illinois of strictly governmental character, and therefore was not exempt from taxation by the Federal Government. However, in the case at bar, the lower court assumed, without definitely deciding, that the University of Illinois was a governmental instrumentality of the State of Illinois, but overruled appellant's protests upon other grounds which we shall later advert to.

It will be noted that in the case of *South Carolina* v. *United States*, *supra*, the court said that, in determining the powers granted in the Federal Constitution, it is relevant to inquire what the men who

framed and adopted the Constitution must have understood to be the meaning and scope of the grants.

It is a matter of history that Harvard University was founded in 1650. Its board of overseers was at first jointly representative of State and Church. Until 1865 it was regarded as a State institution, when by an act of the Massachusetts Legislature the connection with the State was severed. Encyclopedia Britannica (14th ed.), volume 2, page 230. We do not intimate that, at the time of the adoption of the Federal Constitution, Harvard University was in fact a public corporation, performing governmental functions of the State of Massachusetts, but refer to it only for the purpose of showing that at that time the conduct of higher education was regarded by the State of Massachusetts as one of the prerogatives of that State, acting in its sovereign capacity.

In the 1777 constitution of the State of Vermont it was provided by section 40 as follows:

SECTION XL. A school or schools shall be established in each town, by the legislature, for the convenient instruction of youth, with such salaries to the masters, paid by each town; making proper use of school lands in each town, thereby to enable them to instruct youth at low prices. One grammar school in each county, and one university in this State, ought to be established by direction of the General Assembly.

It is an historical fact that, prior to the adoption of our Federal Constitution, many of the States had established public schools at the expense of local taxing districts.

Therefore, applying the test suggested in *South Carolina* v. *United States, supra,* we can not say that the policy of education at public expense was an activity not known to the framers of the Constitution.

Furthermore, in the Ordinance of 1787 for the government of the Northwest Territory, out of which the State of Illinois was later carved, there is found in Article III the following declaration:

Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, and the means of education shall forever be encouraged. * * *

It also appears that in the enabling act for Illinois, enacted by Congress in 1818, it was provided that 3 per centum of the net proceeds of the public lands within the State of Illinois should be appropriated by the legislature of the State—

for the encouragement of learning, of which *one-sixth part shall be exclusively bestowed upon a college or university.* (Italics ours.)

In this connection it is also pertinent to note the familiar passage in Washington's Farewell Message, wherein he said:

Promote, then, as an object of primary importance, institutions for the general diffusion of knowledge. In proportion as the structure of a government gives force to public opinion, it is essential that public opinion should be enlightened.

It is true that there is no mention of education in the Federal Constitution. The reason therefor, no doubt, was that its framers deemed that education, in so far as undertaken by public authority, was a function of the States and was one of those powers reserved to the States.

Certain it is that there is no grant of power in the Federal Constitution, express or implied, to Congress to control or in any way regulate education within the States, but this power has, from the time of the adoption of the Constitution, been regarded as within the sovereign power of the States, subject only to such personal and property rights of the citizens as are protected by the Federal Constitution.

We do not think that in this day it can be said that the conduct of an educational institution by a State is not a legitimate governmental function, nor do we believe that it is a function which should be classed as proprietary and of the general class held subject to taxation by the Federal Government in the case of *South Carolina* v. *United States, supra.*

In the brief of the Government it is contended that—

A strictly governmental function is one that can only be performed by a State, such as the maintenance of a judicial system, as contradistinguished from a proprietary function which may be performed either by a State or by private persons or corporations, such as the maintenance of institutions of higher education, or a system for dispensing intoxicating liquors. Note *Flint* v. *Stone*, 220 U. S. 107, 172.

As a matter of fact, of which this court will no doubt take judicial notice, the best, and no doubt the majority, of institutions of higher education are maintained independently of any State, for example, Harvard, Yale, Princeton, Columbia, Johns Hopkins, Georgetown and George Washington Universities, and literally hundreds of other well-known and renowned institutions of higher education too numerous to mention within the limited confines of this brief.

To assert that the maintenance by a State of an institution of higher education is a necessary adjunct to the existence of a State, desirable as it may be, is so obviously absurd as to require no further argument. Every State institution of higher education could be closed to-day without in the slightest degree endangering the sovereignty of a single State. Closing of such State-maintained institutions might inconvenience certain citizens of the respective States, and be unfortunate, but the State governments would continue to function, and their sovereignty would remain unimpaired.

Said case of *Flint* v. *Stone*, 220 U. S. 107, relied upon by the Government to support its contention above quoted, does not even intimate that a strictly governmental function is one which can be exercised by a State only. In the opinion in that case it is stated:

* * * It may be admitted that the reserved rights of the States, such as the right to pass laws, to give effect to laws through executive action, to administer justice through the courts, *and to employ all necessary agencies for legitimate purposes of State government*, are not proper subjects of the taxing power of Congress. * * * (Italics ours.)

It is further stated in the opinion that—

In this connection *South Carolina* v. *United States*, 199 U. S. 437, 461, is important. In that case it was held that the agents of the State government, carrying on the business of selling liquor under state authority, were liable to pay the internal revenue tax imposed by the Federal Government. In the opinion previous cases in this court were reviewed, and the rule to be deduced therefrom stated to be that the exemption of State agencies and instrumentalities from national taxation was limited to those of a strictly governmental character, and did not extend to those used by the State in carrying on business of a private character.

We think the words "strictly governmental," as used by the Supreme Court, do not mean exclusively governmental, as contended by the Government. If the Government be right in its contention, then many of the activities of the Federal Government are not "strictly governmental," but are subject to taxation by the States. We have a Bureau of Fisheries, and Government property is located in various States used for the propagation of fish. If the measuring rule applied by the Government in the case at bar to education be also applied to the Bureau of Fisheries, it must follow that the property of the United States, used for the propagation of fish, is not used in the performance of a "strictly governmental" function, and may be taxed by the States. Following the argument in the Government's brief, and substituting "fish hatcheries" for the words "an institution of higher education," and the words "Federal Government" for the words "a State," this paragraph of the Government's brief would read:

To assert that the maintenance by the Federal Government of fish hatcheries is a necessary adjunct to the existence of the Federal Government, desirable as it may be, is so obviously absurd as to require no further argument. Every fish hatchery of the Federal Government could be closed to-day without in the slightest degree endangering the sovereignty of the Federal Government. * * *

The same observation may be made as to most of the activities of the Department of Agriculture, the Department of Commerce, the Department of Labor, and many of the independent establishments of the Government. In fact, most of the bureaus in these departments could be abolished "without in the slighest degree endangering the sovereignty" of the Federal Government.

Should any State attempt to tax the property of the Federal Government engaged in activities which are not "necessary adjuncts" to the existence of the Federal Government, we venture to say that the Department of Justice would be the first to repudiate the doctrine contended for in the Government's brief herein; nor are we left to speculation as to the attitude of the Supreme Court of the United States if such tax by a State should be attempted.

In the case of *Panhandle Oil Co.* v. *Knox, supra,* as hereinbefore observed, the State of Mississippi attempted to tax sales of gasoline

to the Federal Government for use by a veterans' hospital at Gulfport, in that State. It was held that the State had no power to impose such tax because said hospital was an instrumentality of the United States.

If the conduct of a university by a State is proprietary because, as the Government contends, there are many private universities and colleges in the country, then by the same reasoning the conduct of a hospital is proprietary because there are thousands of private hospitals in the country. If hospitals conducted by the Federal Government are immune from taxation by the States, and the Supreme Court has expressly held that they are so exempt, although clearly not *necessary* to maintain the sovereignty of the Federal Government, we think it must follow that a State institution like the University of Illinois is likewise exempt from the general taxing power of the Federal Government.

We do not think that education has ever been within the domain of private business in the sense that educational activities conducted by a State should be considered as in the same class as sales of liquor by a State, such as involved in *South Carolina* v. *United States, supra,* or other business which is ordinarily conducted by private citizens for the purposes of profit.

The case of *United States* v. *Baltimore & Ohio Railroad Co.,* 17 Wall. 322, involved the question of whether interest payable to the city of Baltimore upon a loan made by the city to said railroad company as an inducement to said company to make Baltimore its eastern terminus, was exempt from taxation by the Federal Government. The loan was authorized by the Legislature of the State of Maryland.

It was held that such interest was so exempt; in its opinion the court said:

> This advance of the city bonds was not a donation. It was an investment supposed to be judiciously made and adequately secured. It was not for the individual benefit of those managing the business. No one received advantage except as he was a citizen or his property was within the city. It was not a loan for the benefit of the railroad; it was for the benefit of the city solely. That the railroad company was also benefited did not affect the purpose of the transaction.

If the loaning of money by a city to a railroad company to advance the welfare of all the people of that city was the exercise of such a governmental function as exempted interest thereon paid to the city from taxation by the Federal Government, it would seem clear beyond any doubt that the conduct of education by a State, paid for and controlled by it, is the exercise of a strictly governmental function.

If there were any doubt with respect to this question, we think it has been definitely removed by the case of *Burnet* v. *Coronado Oil & Gas Co.,* 284 U. S. ---, decided since the case at bar was argued before us.

In that case, the State of Oklahoma leased to the Coronado Oil & Gas Co., upon a royalty basis, certain oil lands granted by the Federal Government to that State for the benefit of common schools established by it. The grant provided that such lands might be leased by the State.

The Commissioner of Internal Revenue assessed income and excess-profits taxes upon the lessee's net income arising out of the sale of its portion of the oil produced from said lands. The court held that such income was exempt from taxation upon the ground that the lease in question was an instrumentality of the State for the purpose of carrying out her duty in respect to the public schools.

In its opinion the court said:

When Oklahoma undertook to lease her public lands for the benefit of the public schools she exercised a function strictly governmental in character. Consequently, *South Carolina* v. *United States*, 199 U. S. 437, much relied upon, is not in point.

The States are essential parts of the plan adopted by the Federal Constitution; and we accept as settled doctrine that the United States can lay no tax upon their governmental instrumentalities. *Texas* v. *White*, 7 Wall. 700, 725; *Collector* v. *Day*, 11 Wall. 113; *Pollock* v. *Farmers Loan & Trust Co.*, 157 U. S. 429, 584; *Farmers Bank* v. *Minnesota*, 232 U. S. 516, 527.

While four justices dissented from the majority opinion in this case, and two dissenting opinions were rendered, none of the justices dissented upon the ground that the maintenance of common schools by the State was not a strictly governmental function.

It is our opinion that education is a legitimate function of the States and that the functions performed by the appellant here are strictly governmental in carrying out one of the sovereign powers of the State of Illinois, the exercise of which has never been, and can not now be, regarded as within the domain of the conduct of private business for profit.

The Government relies upon the fact that the University of Illinois is the recipient of Federal appropriations, as well as appropriations from the treasury of the State of Illinois, for the purpose of carrying on its activities, as establishing that it is not a strictly governmental instrumentality of the State of Illinois. We think the fact that the University of Illinois is the recipient of Federal appropriations, made to the State for educational purposes, emphasizes, rather than otherwise, our view that the University of Illinois is a strictly governmental agency of the State of Illinois. Such appropriations are made in aid and encouragement of education, and it is because of the high public purpose that education serves that it is encouraged by appropriations by the Federal Government.

Neither does the fact that service fees are charged the students, resulting in a substantial revenue to the university, affect its character. Our Post Office Department is largely supported by charges made for

services rendered, but we do not think that any one would contend that, because of that fact, the functions performed by the Postal Service are not of a strictly governmental character.

The fact that a substantial percentage of the students of the University of Illinois are not residents of the State of Illinois is likewise immaterial. If the State of Illinois desires to give opportunity to residents of other States to enjoy educational facilities afforded and maintained by the State, such fact will not affect the nature of the governmental function of the State providing education of the character here being considered.

It is probably true that a substantial percentage of the students in the public schools of the District of Columbia have parents who are not legal residents of the District of Columbia; but, if that be a fact, it would not affect the strictly governmental character of the functions performed by the schools of the District.

Neither do we think the fact that the University of Illinois is the recipient of certain comparatively small endowments affects its governmental character. We know of no reason why a State, if it sees fit, may not accept gifts to aid it in carrying on either absolutely necessary or other legitimate functions, and the acceptance of such gifts can not affect the character of the functions performed by the State.

While the Government makes some attempt to differentiate between elementary and higher education in the determination of whether the University of Illinois is an instrumentality of the State of Illinois performing strictly governmental functions, we think no such distinction can be made. We may take judicial notice of the fact that there are thousands of private elementary schools in the United States. One great religious denomination provides schools which are under its control for the education of the children of adherents to that faith. Other religious denominations to a lesser extent do likewise. According to the Government's theory, if an institution of higher learning be proprietary because there are many universities and colleges conducted under private auspices, then by the same reasoning all of the public schools of the country are proprietary, and the Federal Government may tax the income of every public school teacher in the land. If a tax by a State upon the sale of gasoline for use in a Federal hospital be invalid, would a direct tax imposed by the Federal Government, apportioned among the States, levied upon the lands and buildings used for school purposes, owned by the State or its subdivisions, be sustained as a valid exercise of the Federal taxing power? We do not think that any one would seriously contend that such a tax would be valid, and we are unable to see any distinction, so far as the general taxing power of the Federal Government is concerned, between

taxing such school buildings and taxing the property of the State of Illinois held in trust for it by appellant, and used for educational purposes as required by the laws of the State of Illinois.

Furthermore, as bearing upon the interest of a State in education, it is well established that it is within the police powers of a State to compel the attendance of children between certain ages at some school, though it has no right to compel such attendance at a public school. *Pierce* v. *Society of Sisters*, 268 U. S. 510. In that case the court said:

No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

With these broad police powers over education, it seems to us that it necessarily follows that, where the State itself deems it necessary or desirable for its welfare to provide schools at public expense in order that opportunity may be afforded for the education of children of the State, the exercise of such power by a State or its legally authorized subdivision is a strictly governmental function, and the conduct of an institution of higher learning by a State, or under an agency created and controlled by the State, is likewise a strictly governmental function.

Without pursuing this branch of the case further, we are of the opinion that appellant is an agency of the State of Illinois engaged in the performance of governmental functions which are immune from the general taxing power of the Federal Government under clause 1, section 8, Article I of the Constitution of the United States.

It is suggested that, even though appellant is immune from the general taxing power of the Federal Government under said clause, such immunity should not extend to import duties such as those here involved, upon the theory that while immunity from direct and excise taxes was reserved to the States, there was no such reservation as to the exaction of import duties. It is suggested that, inasmuch as the States retained their power to levy direct and excise taxes, concurrently with the Federal Government, and surrendered in the Federal Constitution the right to levy import duties and granted to the Federal Government the sole power to levy such duties, it should be implied from these facts that the States, by virtue of their surrender of the power to levy import duties, surrendered their immunity from taxation through import duties levied by the Federal Government.

We can not agree that any such implication arises from the surrender by the States of the right to levy import duties. We see no reason why the surrender of one right theretofore possessed should be construed as the surrender of another and different right possessed

by the States. The right surrendered was the right possessed by the States to levy import duties. Another right possessed by the States was the immunity of governmental agencies of the States from Federal taxation. Why should it be held that a State may be taxed for the support of the Federal Government if the tax levied comes under the term of an import duty, but that it may not be taxed if it comes under the term of an excise tax?

In either case, a State in its sovereign capacity is called upon to contribute, out of its treasury, to the support of the Federal Government, and the tax is laid upon property of the State employed in the performance of essential governmental functions of the State.

We find no warrant, either in the Constitution or a decision of any court, for the segregation of import duties from direct and excise taxes, or for holding that the States are immune from one form of taxes named in the Constitution but not from another also therein named.

That an import duty under the clause of the Constitution here under consideration is a tax can not be questioned; we can find no case where it has been questioned since the decision in *Brown* v. *Maryland*, 12 Wheat. 419, wherein Chief Justice Marshall said: "A duty on imports is a tax on the article paid by the consumer." The following is found in the decision of this court in *United States* v. *Shallus*, 9 Ct. Cust. Appls. 168, 171, 36 Treas. Dec. 391: "The definition of a duty is 'a tax on imposts; excise or customs dues.'"

An action for debt will lie against an importer to recover duties upon goods imported. *Stockwell* v. *United States*, 13 Wall. 531. To the same effect is *Meredith* v. *United States*, 13 Pet. 486.

If, therefore, an import duty is a tax, and if there be in the Constitution an implied exemption of the States from taxation by the Federal Government, in so far as their essential governmental functions are concerned, we are unable to perceive upon what theory the import duties here involved may be sustained, holding as we do that the University of Illinois is an instrumentality of the State of Illinois performing an essential governmental function of that State.

The majority opinion of the court below, as heretofore stated, assumed that the University of Illinois was an instrumentality of the State of Illinois engaged in the performance of a governmental function, but overruled the protests upon the ground that the payment of import duties by the appellant would not destroy the University of Illinois or noticeably impair its efficiency. In concluding said majority opinion it was said:

The plaintiff failed to show that the university would be destroyed if it were prevented from importing merchandise, and, indeed, probably could not make such a showing. The university expends yearly about five millions of dollars. Of this amount probably not to exceed five thousand dollars are spent for merchandise produced in foreign countries, or one one-hundredth of 1 per cent. It

surely will not be seriously contended that to close the door to such importations would destroy the institution, or noticeably impair its efficiency.

The lower court, in arriving at its conclusion, relied especially upon the cases of *Metcalf & Eddy* v. *Mitchell, supra, Willcuts* v. *Bunn, supra,* and *Educational Films Corp. of America* v. *Ward,* 282 U. S. 379. It quoted from the first of these cases as follows:

In such a situation it can not be said that the tax is imposed upon an agency of government in any technical sense, and the tax itself can not be deemed to be an interference with government, or an impairment of the efficiency of its agencies in any substantial way. * * * we do not find that it impairs in any substantial manner the ability of plaintiffs in error to discharge their obligations to the State or the ability of a State or its subdivisions to procure the services of private individuals to aid them in their undertakings. Cf. *Central Pacific Railroad* v. *California,* 162 U. S. 91, 126. We therefore conclude that the tax in No. 183 was properly assessed.

It also quoted from *Willcuts* v. *Bunn, supra,* as follows:

Before the power of the Congress to lay the excise tax in question can be denied in the view that it imposed a burden upon the States' borrowing power, it must appear that the burden is real, not imaginary; substantial, not negligible.

It also quoted from *Educational Films Corp. of America* v. *Ward, supra,* as follows:

This court, in drawing the line which defines the limits of the powers and immunities of State and National Governments, is not intent upon a mechanical application of the rule that government instrumentalities are immune from taxation, regardless of the consequences to the operations of government. The necessity for marking those boundaries grows out of our constitutional system, under which both the Federal and the State Governments exercise their authority over one people within the territorial limits of the same State. The purpose is the preservation to each government, within its own sphere, of the freedom to carry on those affairs committed to it by the Constitution, without undue interference by the other.

It is clear that the lower court failed to distinguish between a tax levied by the Federal Government directly upon a State or upon one of its instrumentalities performing only an essential governmental function, and a tax laid upon an individual or corporation engaged in private business, performing as a part of its business some governmental function. In each of the cases relied upon by the lower court, the taxpayer was engaged in business for profit and was an instrumentality of government only in an incidental way. In none of said cases was the tax levied upon and paid by the State or one of its instrumentalities performing only essential governmental functions.

In the quotation relied upon by the lower court from the decision in *Metcalf & Eddy* v. *Mitchell, supra,* it was said:

In such a situation it can not be said that the tax is imposed upon an agency of government in any technical sense.

In the case at bar the tax is imposed directly upon an agency of government "in a technical sense," and is paid directly out of the State treasury.

In the case of *Willcuts* v. *Bunn, supra,* it was held in effect that, even though the tax was not imposed directly upon an agency of government, nevertheless if the tax imposed a burden upon the States' borrowing power, and was real and not imaginary, substantial and not negligible, it could not be upheld. In the case at bar the burden is real, not imaginary, because directly imposed upon an agency of government and actually paid by the State of Illinois.

We think the rule is well established that, where a tax is imposed directly by the Federal Government upon an agency of a State engaged wholly in the performance of an essential governmental function, such tax is invalid, and where the instrumentality is of this class, exemption does not depend upon the degree of burden. *Gillespie* v. *Oklahoma,* 257 U. S. 501; *Metcalf & Eddy* v. *Mitchell, supra.*

Evidently the lower court overlooked the principle last above stated, and that principle is founded upon an absolute want of power in the Federal Government to tax an instrumentality of a State engaged wholly in the performance of an essential governmental function. If there be want of power to levy a tax, the fact that the burden sought to be imposed is small is utterly irrelevant to the question of the validity of the tax.

In the case of *Johnson* v. *Maryland,* 254 U. S. 51, 55–56, the court said:

* * * With regard to taxation, no matter how reasonable, or how universal and undiscriminating, the State's inability to interfere has been regarded as established since *McCulloch* v. *Maryland,* 4 Wheat. 316. The decision in that case was not put upon any consideration of degree but upon the entire absence of power on the part of the States to touch, in that way at least, the instrumentalities of the United States; 4 Wheat. 429, 430; and that is the law to-day. *Farmers & Mechanics Savings Bank* v. *Minnesota,* 232 U. S. 516, 525, 526. * * *

Of course, as heretofore shown, the same rule applies to the immunity of the States from Federal taxation as in the case of the immunity of the Federal Government from taxation by the States.

In *Indian Motocycle Co.* v. *United States, supra,* the court said:

It is an established principle of our constitutional system of dual government that the instrumentalities, means and operations whereby the United States exercises its governmental powers are exempt from taxation by the States, and that the instrumentalities, means, and operations whereby the States exert the governmental powers belonging to them are equally exempt from taxation by the United States. This principle is implied from the independence of the national and state governments within their respective spheres and from the provisions of the Constitution which look to the maintenance of the dual system. *Collector* v. *Day,* 11 Wall. 113, 125, 127; *Willcuts* v. *Bunn,* 282 U. S. 216, 224–225. *Where the principle applies it is not affected by the amount of the particular tax or the extent of the resulting interference, but is absolute. McCulloch* v. *Maryland,* 4 Wheat.

316, 430; *United States. v. Baltimore & Ohio R. Co.*, 17 Wall. 322, 327; *Johnson v. Maryland*, 254 U. S. 51, 55–56; *Gillespie v. Oklahoma*, 257 U. S. 501, 505; *Crandall* v. *Nevada*, 6 Wall. 35, 44–46. (Italics ours.)

In our opinion, the foregoing authorities establish that, in a case like that at bar, the amount of the tax imposed, or whether its imposition would substantially interfere with or embarrass the State of Illinois, is wholly immaterial because, as stated in the last case cited, the exemption is absolute in the class of cases of which this is one.

The Government further contends that the regulation of foreign commerce is a plenary power conferred upon the Federal Government, and that the right to tax follows the right to regulate.

We can not agree with the statement that the right to tax follows the right to regulate foreign commerce. Each is a separate and independent power, although contained in the same section of Article I of the Constitution. Government counsel have cited no cases in support of their contention that the right to tax imports follows the right to regulate foreign commerce, and we have found none.

We are clear that no grant of power can be implied from the commerce clause of the Federal Constitution that would impair or destroy a right impliedly secured by other parts of the Constitution. That is to say, the immunity of the States from Federal taxation was not destroyed by the grant to the Federal Government of the right to regulate foreign commerce.

In the case of *Adair* v. *United States*, 208 U. S. 161, the court said:

\* \* \* We need scarcely repeat what this court has more than once said, that the power to regulate interstate commerce, great and paramount as that power is, can not be exerted in violation of any fundamental rights secured by other provisions of the Constitution. *Gibbons* v. *Ogden*, 9 Wheat. 1, 196; *Lottery Case*, 188 U. S. 321, 353.

It is without doubt true that, where the power of taxation exists, it may be used as a means of regulating commerce. Indeed, said clause 1, section 8, Article I, expressly provides that Congress shall have power to lay taxes, duties, and imposts to provide for the general welfare of the United States.

In the case of *Hampton & Co.* v. *United States*, 276 U. S. 394, affirming upon review a decision of this court, 14 Ct. Cust. Appls. 350, T. D. 42030, involving certain provisions of the Tariff Act of 1922, the Supreme Court, speaking through Chief Justice Taft, said:

So long as the motive of Congress and the effect of its legislative action are to secure revenue for the benefit of the General Government, the existence of other motives in the selection of the subjects of taxes can not invalidate congressional action. As we said in the *Child Labor Tax Case*, 259 U. S. 20, 38: "Taxes are occasionally imposed in the discretion of the legislature on proper subjects with the primary motive of obtaining revenue from them, and with the incidental motive of discouraging them by making their continuance onerous. They do not lose their character as taxes because of the incidental motive." And so

here, the fact that Congress declares that one of its motives in fixing the rates of duty is so to fix them that they shall encourage the industries of this country in the competition with producers in other countries in the sale of goods in this country, can not invalidate a revenue act so framed. * * *

It is our opinion that the commerce clause of the Constitution neither expressly nor by implication confers upon Congress any power to levy taxes upon any object otherwise immune from taxation. Therefore, if the States are immune from taxation by the Federal Government under clause 1, section 8, Article I of the Constitution, as they are in so far as they perform essential governmental functions, the grant of power in clause 3 of said section 8 does not affect such immunity, and the commerce clause of the Constitution may not be resorted to for the purpose of levying import duties upon the States in so far as they are engaged in the performance of essential governmental functions.

The Government makes two other contentions upon this branch of the case. The first is that there has been a legislative and administrative construction of the Constitution which warrants us in holding that the University of Illinois is not exempt from the imposition of duties levied upon merchandise imported by it to be used for educational purposes.

There is no proof in the record of any administrative construction or practice, and the only legislative construction relied upon is the fact that since 1897 the tariff acts have provided for free entry of certain merchandise imported by States, etc., for exhibition purposes, and the further fact that, from 1790 to 1862, scientific and philosophical apparatus was given free entry in the various tariff acts, and that since 1862 such merchandise has been at times dutiable and at other times free.

With respect to the provision for free entry of certain merchandise by States for exhibition purposes, we would observe that this was first provided for in the Tariff Act of 1897, and many years before that time, as we have shown, the Supreme Court of the United States had decided that the Federal Government had no power to impose taxes upon the States or their instrumentalities in so far as they were engaged in the performance of essential governmental functions. Obviously, a provision in a tariff law that under certain conditions free entry of merchandise should be accorded to the States can not give rise to any implication that, otherwise, merchandise imported by States is subject to duty, when, long before the enactment of such law, it has in principle been determined by the Supreme Court of the United States that, under the Constitution, Congress is without power to levy such a tax.

With regard to the Government's suggestion respecting the treatment of scientific and philosophical instruments in various tariff acts,

we fail to see any relevancy whatever in such fact. It is not contended that Congress ever specified that such instruments, when imported by States or their instrumentalities, should be dutiable or free in the various tariff acts, but merely that such instruments generally should be free or dutiable.

The Government also points out that the Federal Government pays duties upon all merchandise imported for its own use, and it is argued that therefore it should be implied that it has a right to exact duties upon merchandise imported by the States for governmental purposes. Of course, the United States does not actually pay duties upon merchandise imported for its own use, except in form. What is paid out from the Treasury in the form of duties is immediately turned back to the Treasury in the form of revenue. When the transaction is completed, the Government is not poorer by one dollar, except that it has paid something in the way of expenses for the gesture of collecting money from itself. Of course it is done merely as a convenient means of bookkeeping and supervision of appropriations. It can have no bearing upon the question before us. Because a man may choose to transfer money from one pocket to another does not indicate that he has a right to reach into another man's pocket and transfer money he finds there to his own.

We now proceed to the next major contention of the Government, viz, that under the power to regulate commerce the importation of merchandise is a privilege, not a right, and Congress may lawfully exact, as a condition of the exercise of such privilege, the payment of the duties here in question.

If the paragraphs of the Tariff Act of 1922 here under consideration purported to be, or were in fact, primarily regulations of commerce, the question raised by the Government upon this branch of the case would be pertinent; but the duties provided under the various paragraphs of said act here involved do not purport to be, nor are they, in fact, primarily regulations of commerce. It is true that the title of the act declares it to be—

An Act To provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, and for other purposes,

and it is undeniably true that there are provisions of the act which depend for their validity upon the commerce clause of the Constitution. Section 305 is of this character, which prohibits the importation of the articles therein named; but the dutiable paragraphs of the act are primarily for revenue, and while commerce may also be incidentally regulated by the imposition of the duties provided for, the validity of their imposition must rest upon the taxing power granted by said clause 1, section 8, Article I of the Constitution.

Though not expressly stated, this is clearly implied in that part of the opinion of Chief Justice Taft in the case of *Hampton & Co.* v.

*United States, supra,* hereinbefore quoted. We repeat and italicize the first part of said quotation:

*So long as the motive of Congress and the effect of its legislative action are to secure revenue for the benefit of the general government, the existence of other motives in the selection of the subjects of taxes can not invalidate Congressional action.* \* \* \*

In none of the paragraphs of said Tariff Act of 1922 fixing duties is there any indication that the primary purpose of the duties therein provided was not to raise revenue for the benefit of the General Government.

If the contention of the Government, that the validity of the duties involved herein is not dependent upon the taxing power of Congress, but may be sustained under its power to regulate commerce, be valid, then it must follow that such duties are not governed by that part of said clause 1 which provides that "all duties, imposts, and excises shall be uniform throughout the United States." It likewise would follow that, if the Government's contention be correct, none of the dutiable paragraphs of said tariff act are subject to said uniformity clause, for it may be contended with equal reason that all of them are regulations of commerce and do not depend for their validity upon the taxing power of Congress.

It has been established that regulations under the commerce clause are not controlled by the uniformity clause of said clause 1, section 8, Article I of the Constitution. *Cooley* v. *Board of Wardens of Port of Philadelphia,* 12 How. 298; *Alaska* v. *Troy,* 258 U. S. 101.

However, it is unnecessary to pursue this discussion further because it has been established by the Supreme Court of the United States that the act of laying import duties is an exercise of the taxing power of Congress and not of the power to regulate commerce.

In the leading case of *Gibbons* v. *Ogden,* 9 Wheat. 1, 199, the court, speaking through Chief Justice Marshall, said:

We must first determine, whether the act of laying "duties or imposts on imports or exports," is considered, in the Constitution, as a branch of the taxing power, or of the power to regulate commerce. We think it very clear, that it is considered as a branch of the taxing power. It is so treated in the first clause of the 8th section: "Congress shall have power to lay and collect taxes, duties, imposts, and excises"; and before commerce is mentioned, the rule by which the exercise of this power must be governed, is declared. It is, that all duties, imposts, and excises shall be uniform. In a separate clause of the enumeration, the power to regulate commerce is given, as being entirely distinct from the right to levy taxes and imposts, and as being a new power, not before conferred. The Constitution, then, considers these powers as substantive, and distinct from each other; and so places them in the enumeration it contains. The power of imposing duties on imports is classed with the power to levy taxes, and that seems to be its natural place. \* \* \*

In the *State Tonnage Tax Cases,* 12 Wall. 204, the court, after citing *Gibbons* v. *Ogden, supra,* said:

Whether the act of laying and collecting taxes, duties, imposts, and excises was a branch of the taxing power or of the power to regulate commerce, was

directly under consideration in the case last cited, and it was conclusively settled that the exercise of such a power must be classed with the power to levy taxes. Had the Constitution, therefore, contained no prohibition, it is quite clear that it would have been competent for the States to levy duties on imports, exports, or tonnage, as they had done under the Confederation.

It has been suggested that the case of *Russell* v. *Williams*, 16 Otto 623, is contrary to the views expressed in the cases last above cited, but we are not of that opinion. That case involved the question of whether an act of Congress imposing an additional duty of 10 per centum ad valorem upon goods produced in countries east of the Cape of Good Hope, when imported from places west of the Cape of Good Hope, was impliedly repealed by a subsequent act of Congress. The court held that it was not for the reason that said 10 per centum additional duty was "intended as a general regulation of commerce." There was not involved the question of whether said 10 per centum additional duty was a lawful exercise of the taxing power of Congress. It apparently was conceded that it was such; but the court found that it was intended also as a regulation of commerce. So construed, the decision is in harmony with *Gibbons* v. *Ogden, supra,* and the *State Tonnage Tax Cases, supra,* and is in harmony with the opinion of the Supreme Court in *Hampton & Co.* v. *United States, supra.* The effect of the court's decision in *Russell* v. *Williams, supra,* is simply that, inasmuch as the act there under consideration, levying additional duties, had the incidental purpose of a regulation of commerce, it was not repealed by a subsequent act changing the ordinary rate of duties upon goods to which the additional duties applied.

This, we think, is made plain from that part of the opinion which states, after citing the case of *Sturges* v. *The Collector,* 12 Wall. 19, which involved the construction of the same act of Congress as the court was there considering:

\* \* \* The court, speaking through Mr. Justice Clifford, referred to the evident purpose of Congress, *not only to augment the revenue,* but to make a discrimination "in favor of the direct trade." \* \* \* (Italics ours.)

Immediately following the language above quoted, the court said: "In conformity with the principle of these decisions, \* \* \*," thereby clearly indicating the court's approval of the view expressed in *Sturges* v. *The Collector, supra,* that the purpose of Congress in providing the additional duty was to augment the revenue, and hence the duty rested upon the taxing power of Congress, and, in addition, as an incident thereto, had the purpose of a regulation of commerce.

We would observe further, in this connection, that if said 10 per centum additional duty involved in the case last cited could be considered as a regulation of commerce only, such additional duty would not be subject to the uniformity clause of said clause 1, section 8, Article I of the Constitution, and one rate of additional duty might

have been made if importations of the character there being considered were entered at the port of San Francisco, and a different rate of additional duty if entered at the port of New York. We think no one would contend that such a law could be sustained as a regulation of commerce, separate and apart from the power to lay duties. Clearly, an additional duty that also serves as a regulation of commerce would be subject to the requirement of uniformity and, even though it was effective as a regulation of commerce and might be so considered for certain purposes, its validity must rest upon the taxing power of Congress and not upon the power to regulate commerce.

In the case at bar, as we have heretofore indicated, Congress had no power to levy the duties here in question under the taxing power granted by the Constitution, and it is our view, sustained by the cases hereinbefore cited, that an import duty can not be sustained as a regulation of commerce alone when there is a want of power to tax the goods upon which the duty is laid for the purposes of revenue.

As it is our conclusion that the paragraphs of said Tariff Act of 1922 here involved do not constitute primarily regulations of commerce, but are an attempted exercise of the taxing power of Congress, it is unnecessary for us to consider the question of whether Congress has the power under the commerce clause of the Constitution arbitrarily to prohibit the importation of the merchandise here involved. Much of the argument in this case has been devoted to this question, the Government contending for, and the appellant denying, the existence of such power.

We may, for the purposes of this case, admit the Government's contention that the Government may arbitrarily place an embargo upon the importation of any goods, and that, as an incident of such power, it may conditionally permit the importation upon which it has a right to place an embargo. We repeat that there is nothing in the dutiable paragraphs of the Tariff Act of 1922 which indicates a purpose of Congress to impose duties primarily for the purpose of regulation, but on the contrary it is clear that the primary purpose of the enactment of the dutiable paragraphs was to raise revenue under the taxing clause of the Constitution.

For this reason we consider that the question of the right of the Government arbitrarily to place an embargo upon merchandise of the character here involved is irrelevant to the determination of the question of the validity of the duties assessed upon the goods here involved.

The questions here considered are of the highest importance; there are involved the respective rights of the Federal Government and the States with respect to the immunity from taxation of the States by the Federal Government upon the one hand, and the immunity

of the Federal Government from taxation by the States upon the other.

. While it may be conceded that the conclusion we have reached may conceivably result in depriving the Federal Government of considerable revenue, it is also true that, if certain contentions of the Government were correct, a substantial part of the activities of the Federal Government would be subject to taxation by the States.

We think the conclusion we have reached is in harmony with the decisions of the Supreme Court of the United States and is necessary if the respective sovereign rights of the States and the Federal Government are to be preserved.

In our opinion, for the reasons stated, the judgment of the United States Customs Court should be *reversed* and the cause remanded with directions to *sustain* the protests.